## CRAIG v. CALIFORNIA VINEYARD CO.
### (46 Pac. 421.)

1. RIGHT OF COURT TO REFER CAUSE—EXAMINATION OF ACCOUNTS—CODE, §§ 397, 815.—The Circuit Court of Multnomah County, if a case before it involves the examination of long and complicated accounts, may, without the consent of the parties, refer it to a referee; and, where one branch of a case requires twenty-six pages of account for its statement, the reference is justified.

2. FRAUDULENT TRANSFERS—RIGHTS OF CREDITORS.—Upon a full review of the evidence in this case it is established that there was such a fraudulent application of the assets of the California Vineyard Co., to the payment of the private debts of James Wolfsohn due the Merchants' National Bank of Portland, Oregon, as to render void, so far as attaching creditors are concerned, the bill of sale to and the judgment obtained by said bank against said vineyard company.

3. DIVERSION OF ASSETS—CREDITOR'S BILL.—Where corporate assets have been diverted to the payment of private debts, equity will pursue the assets so diverted, and apply them, if recovered, to the payment of the corporate debts, according to their respective priorities.

4. ATTACHMENT VOID FOR FRAUD.—Where an attachment action is intentially brought on a false claim, or on a claim that is known to be partly false, the whole proceeding will be held void as against subsequent attaching creditors; though this may not be true where the just and false are inadvertently blended in one claim.

5. RIGHT TO REPLEVIN FOR FRAUD OF VENDEE.—Where an insolvent orders large quantities of goods in anticipation of failure, for the purpose of surrendering them to a preferred creditor, and such goods are thereafter fraudulently attached by such creditor, the vendors of the property thus obtained may rescind the sales, and bring replevin to recover possession of their respective goods.

From Multnomah: LOYAL B. STEARNS, Judge.

This is a suit in equity by sundry creditors of the California Vineyard Company, of Portland, to set aside certain conveyances and attachments as fraudulent, and to determine the distribution of the assets that might be discovered and saved by a receiver. Chas. A. Malarkey, as receiver, sold all the property of the company that could be found, and paid the proceeds into the registry of the court. There was a decree as prayed for, from which the Merchants' National Bank, Julius Loewenberg and Penumbra Kelly, sheriff, appeal.

AFFIRMED.

For appellants there was a brief over the names of *Whalley & Muir,* and *Gearin, Silvestone, Murphy & Brodie,* with oral arguments by *Messrs. John W. Whalley* and *John M. Gearin.*

For respondents there was a brief over the names of *Cox, Cotton, Teal & Minor, Raphael Citron, Dolph, Mallory & Simon, Williams, Wood & Linthicum, Robert G. Morrow,* and *J. M. Bower,* with oral arguments by *Messrs. Joseph N. Teal, Joseph Simon* and *J. M. Bower.*

Opinion by MR. CHIEF JUSTICE MOORE.

This is a suit by C. W. Craig and others to set aside a bill of sale executed by and a judgment rendered against the California Vineyard Company, a corporation, to enjoin the sale of its property under an execution issued upon said judgment, and for the appointment of a receiver. The material facts are that about July 1, 1891, the defendant James Wolfsohn, under the name of the California Vineyard Company, opened a liquor store at Portland, but, having no means wherewith to carry on the business, the defendant the Merchants' National Bank, of which the defendant Julius Loewenberg was president, advanced money there-

for, which on October 4, 1892, amounted to and was evidenced by Wolfsohn's promissory note of $20,000.00, and Loewenberg also loaned him $2,250.00.   Prior to January 1, 1893, one Louis Kuhn loaned him $10,610.85 more, and on that day the California Vineyard Company, having been duly incorporated, commenced business as a wholesale dealer in wines and liquors, with a capital stock of $100,000.00, divided into 1,000 shares of the par value of $100.00 each, of which Wolfsohn subscribed for 249, Kuhn 250, and one W. L. Boise one share.   When the company incorporated, Wolfsohn, having prepared a trial balance showing his assets to be $31,691.80, and liabilities $17,-691.80, transferred to the corporation all the goods and property of his former business, subject to the payment of his debts for such goods; and Kuhn, from the amount so loaned by him, was credited with $7,000.00 on account of his subscription to the capital stock, and Wolfsohn obtained credit on his subscription thereto for a like amount on account of the said transfer to the corporation.   On February 28, 1893, Louis Kuhn died testate, and Louise Kuhn, his widow, having been appointed executrix of his last will and testament, duly qualified as such, and entered upon the discharge of her trust.   On February 28, 1893, the California Vineyard Company executed to the Merchants' National Bank its promissory note for $25,000.00, payable in ninety days, with interest after maturity, and on March 1 of that year obtained a credit therefor of $24,000.00, of which $14,563.11 was applied in discharging overdrafts.   On May 23, 1893, Wolfsohn having paid from the assets of the corporation $250.00 on account of the money loaned by Kuhn, executed to Louis Kuhn his three promissory notes amounting to $10,360.85, payable in six, nine, and twelve months; and in consideration therefor the executrix assigned to him the shares of stock of said corporation subscribed by Kuhn, but held the

certificates thereof as collateral security for the payment of said notes. The Merchants' National Bank, on June 28, 1893, loaned to the corporation $5,000.00, taking its note therefor, and on September 13 of that year this note and the one for $25,000.00 were taken up, and another for $30,000.00 was executed by the corporation in lieu thereof. At the same time, upon the advice and request of Loewenberg, it executed the following notes: To the Merchants' National Bank, $20,000.00, on account of Wolfsohn's said note of October 4, 1892; to Loewenberg, $2,250.00, on account of money loaned by him to Wolfsohn; and to Louise Kuhn, $10,360.85, on account of Wolfsohn's notes to her, each of which was made payable on demand, with eight per cent. interest from that date, but the note to Mrs. Kuhn was deposited with Loewenberg, to prevent her from maintaining an action thereon and attaching the property of the corporation; and as a consideration for the execution of said notes Wolfsohn gave the corporation his promissory note for $32,610.85, the amount of the notes so executed by it. On February 12, 1894, the note of $20,000.00 was taken up, and notes of $8,000.00 and $12,000.00 were executed by the corporation in lieu thereof, the interest thereon to that date amounting to $666.65 having been fully paid.

On March 12, 1894, while being hard pressed by its creditors, and unable to secure any further advances from the bank, the corporation instituted a branch house at Tacoma, Wash., and ordered from eastern dealers and shipped from its Portland store to the branch house goods of the value of $14,503.00. On February 22, 1894, the corporation paid $320.00 interest on the $12,000.00 note to June 12 of that year, and on May 24, $120.00 interest on the $8,000.00 note, making $1,106.65 paid out of the assets of the corporation to the bank on account of Wolfsohn's private debt, and on the date last mentioned paid

Loewenberg $113.50 more, as interest on the $2,250 note from September 13, 1893, to May 1, 1894. It also paid Mrs. Kuhn, as interest on her notes for $10,360.85, eight monthly installments of $69.17 each, amounting to $552.56, and, upon Loewenberg's advice and at his request, it paid money and delivered invoices of goods to Mrs. Kuhn in payment of Wolfsohn's debt, amounting to $7,262.83, thereby taking up two of his notes, and having a credit indorsed in the third, and making the total amount of the assets of the corporation thus diverted $9,035.54. On May 24, 1894, the corporation discounted to the said bank certain notes executed to it, amounting to $907.22, to which Wolfsohn added his note for $32,-610.85, and thus secured an apparent cash credit for the corporation of $33,518.07 upon the books of the bank, against which it drew a check in favor of the bank for $20,120.00 in payment of its said notes for $12,000.00 and $8,000.00, and another for $2,800.00 which was credited on the $30,000 note, the balance of the credit having been applied on an overdraft of the corporation. On May 31, 1894, it executed a bill of sale of its stock of goods at Tacoma to the bank, whose agent took possession of the same, and filed the bill of sale for record; and, in consideration of the transfer, the bank paid $592.25 on account of some expenses in the management of the branch house, and endorsed a credit of $10,000.00 on said note for $30,000.00, and on the next day commenced an action in the Circuit Court of Multnomah County against the California Vineyard Company to recover $17,200.00 as the balance due thereon, and for $1,750.00 attorneys' fees; and, having duly sued out a writ of attachment, the defendant Penumbra Kelly, as sheriff of said county, in pursuance thereof, attached all the goods of the corporation in his store at Portland. Thereafter actions were commenced in said court against the California Vineyard

Company by the plaintiffs in this suit as follows: By C. W. Craig & Co., for $1,351.00; Iler & Co., $2,087.64; Eisen Vineyard Co., $1,285.93; Wm. Wolf & Co., $2,664.95; Siedeman, Lachman & Co., $566.70; S. Lachman & Co., $3,087.16; H. H. Veuve, $776.03; C. H. Arnold, $765.78; M. de Grousseau, $1,420.70; and L. Jacobi, $986.00; and, having sued out writs of attachment, the goods of the orporation at Portland were also attached in these actions. The Merchants' National Bank obtained judgment by default for the amount demanded, and an order for the sale of the attached property; and, an execution being issued thereon, the sheriff advertised the same for sale on June 25, 1894, on which day the plaintiffs herein, having obtained judgments in their respective actions, and orders for the sale of said goods, and executions issued thereon having been returned nulla bona, commenced this suit, on behalf of themselves and all other creditors of the California Vineyard Company who might desire to join with them and pay their pro rata share of the expenses thereof, alleging that the defendant James Wolfsohn, manager of the company, and Julius Loewenberg, president of the Merchants' National Bank, entered into a conspiracy to hinder, delay, and defraud the creditors of said corporation, in pursuance of which the bank unlawfully absorbed all its assets; that the Califorina Vineyard Company at the time said bill of sale was executed was, and for a long time prior thereto had been, hopelessly insolvent, which fact was well known by Wolfsohn, Loewenberg, and the other officers of the bank, and pray for the relief hereinbefore stated.

The court granted a temporary injunction, restraining the sheriff from selling said goods, and appointed a receiver, who took possession of the attached property, and also of the stock of goods which had been shipped to Portland from Tacoma, and, by order of the court, sold

most of them. The issues having been joined, the cause was, without the written consent of the parties, referred to John Catlin, Esq., with directions to take and report the evidence with his findings of fact and law therefrom. Thereafter actions were, by consent of the court, brought against the receiver for the recovery of certain portions of the property so held by him, to wit: By Cook & Burnheim Co., to recover the possession of fifteen barrels of whiskey, valued at $1,419.58; I. de Turk, three barrels and six half barrels of brandy, of the value of $579.45; Kohler & Frohling, certain wines valued at $1,571.58; and A. Dausseau, three bales of corks of the value of $357.00, and the several issues embraced therein submitted for determination in this suit by stipulation of the parties. The referee having found for the plaintiffs in the replevin actions, and for the plaintiffs in this suit, the court in the main affirmed his report, and decreed: (1) that the judgment rendered in favor of, and the bill of sale executed to, the Merchants' National Bank, so far as the plaintiffs are concerned, be set aside; (2) that there be paid to the plaintiffs in the replevin actions, from the money arising from the sale of the goods and deposited with the clerk by the receiver, the following amounts, to wit: To the Cook & Burnheim Co., $1,050.00; I. de Turk, $490.00; Kohler & Frohling, $806.03, and the firm last named was also awarded the possession of two barrels of Zinfandel, two barrels of Burgundy, and one barrel of Reisling wine; and A. Dausseau was awarded the possession of three bales of corks, the goods so awarded to these parties not having been sold by the receiver; (3) that the remainder of the proceeds of such sale be applied to the satisfaction of the several judgments obtained by the plaintiffs in this suit, but, if insufficient for that purpose, then to be applied thereon pro rata; (4) that the California Vineyard Company recover of the defendant Julius Loewenberg the sum of $363.50;

(5) that the injunction be made perpetual; (6) that, should any moneys remain after the application of the proceeds of such sale as hereinbefore decreed, the same to be paid to the Merchants' National Bank; (7) and that the plaintiffs recover of the defendants the Merchants' National Bank, Julius Loewenberg, and James Wolfsohn, their costs and disbursements, other than the expenses of the receiver, from which decree the defendants the Merchants' National Bank, Julius Loewenberg, and Penumbra Kelly appeal.

1.    It is contended by counsel for the defendants that this suit does not involve the examination of long or complicated accounts, and, the parties not having consented thereto, in writing, the court erred in referring the cause, and that the decree should therefore be reversed, and the cause remanded for trial by the court.   The power of the Circuit Court of Multnomah County to refer an issue of fact in a suit in equity to a referee for trial is limited to causes involving the examination of long and complicated accounts: Section 397, Hill's Code, as amended by an act of the legislative assembly, approved February 20, 1893 (Laws 1893, p. 26).   The plaintiffs having alleged in their amended complaint that the indebtedness claimed by the Merchants' National Bank against the California Vineyard Company was the personal debt of the defendant James Wolfsohn, prayed that the bank, its officers and agents be compelled to disclose the true character of its pretended claim against said corporation, in response to which the cashier of the bank prepared and submitted to the plaintiffs a statement of its account, forming the consideration for its note of $30,000.00, which is printed in and occupies twenty-six pages of the appellants' brief. The court evidently entertained the opinion that this account was sufficiently long and complicated to bring the suit within the accepted cases in which a reference is

authorized by statute, and we see no reason to doubt the correctness of its action in referring the cause under the circumstances.   Section 815, Hill's Code, as amended by an act of the legislative assembly, approved February 20, 1893 (Laws 1893, p. 26). deprives the trial courts of the power they possessed under the former act to refer an issue of fact in a suit in equity to a referee, with direction to report the conclusions of fact and law as found by him. The manifest object of this amendment is to compel a trial by the court of the issues of fact and law in equity cases, to the end that it may observe and note the appearance of the witnesses, and their manner of testifying, thereby materially aiding the court in weighing the evidence, and reaching a correct conclusion therefrom; and when it becomes necessary to refer an issue of fact to a referee in an equity case, it is incumbent upon the court to reach its conclusions of fact and law from the evidence reported, uninfluenced by any opinion of the referee thereon.   The evidence is all before us, and the issues are here for trial de novo, so that there can be no good reason for reversing the decree, and remanding the cause for trial by the court without a reference, presuming, as we must, that the trial court reviewed the evidence, and reached its conclusions therefrom; but, as it did not see the witnesses, it could not note their manner of testifying, and hence had no advantages in reaching its conclusions superior to this court, and this being so a careful examination of the evidence becomes necessary.

2.   The decree complained of proceeds upon the theory that the defendants Wolfsohn and Loewenberg were guilty of such acts of actual fraud in their dealings with the California Vineyard Company and its assets as to render void, as to the plaintiffs, the bill of sale executed to and the judgment obtained by the Merchants' National Bank.   After carefully reviewing the evidence relied upon,

we think the allegations of fraud have been established. It appears that Loewenberg conceived the idea that the California Vineyard Company should assume and pay Wolfsohn's debts, and upon his request the corporation, on September 13, 1893, executed its notes for that purpose, and the bank thereafter collected interest thereon until May 22, 1894, when they were surrendered, and Wolfsohn's note given in lieu thereof; but this exchange of the evidence of indebtedness did not place the corporation in statu quo, because the amount of interest collected on Wolfsohn's debt was not credited upon the $30,000.00 which was due from the California Vineyard Company to the Merchants' National Bank.  Loewenberg was a brother-in-law of Louis Kuhn, and, upon the death of the latter, his widow, being anxious to ascertain the condition of her deceased husband's estate, applied to and obtained from Wolfsohn a statement of the assets and liabilities of the company, and Loewenberg, learning she had obtained such information, became offended thereat, and told her if the condition of the corporation became known its creditors would close out the business, and neither she nor the bank would obtain anything; but that if the management of her business were instrusted to him, he would be able to secure the payment of both claims.  Mrs. Kuhn testifies that Loewenberg promised to look after her interests, and to see that her claim was protected; but he, testifying upon this subject, says: "All I would say was, I would look out for her interests as I had my own.  And I did better, as she got, I believe, some $7,800.00 worth of stuff, and I haven't anything for my indebtedness; he owes me $2,250.00.  I am a creditor of the California Vineyard Company to that amount."  The bank would probably not be bound by Loewenberg's management of Mrs. Kuhn's claim against Wolfsohn, and the fact is noted only to show Loewenberg's method of securing the payment

of Wolfsohn's debts at the expense of the California Vineyard Company.   In this connection another circumstance may be cited that tends to show the relation existing between Wolfsohn and Loewenberg.   About two weeks before the goods were attached, Wolfsohn sent from the store of the corporation to Loewenberg's house a quantity of goods, which the witness H. S. Tulley, an employe in the store, says consisted mostly of imported goods, ales and French wines; and J. A. Love, the drayman who delivered the same, testifies that he took a receipt for them in the delivery book of the corporation, and that they consisted of two barrels of what he supposed to be ginger ale, and ten or twelve cases of mineral water.   The delivery book of the corporation being offered in evidence discloses that three pages had been torn therefrom containing the dates from April 9 to May 14, 1894.   Wolfsohn testifies that the value of the goods so delivered was about $200.00 or $300.00, more or less, and that he was to receive a credit therefor on his note to Loewenberg of $2,250.00, but the books of the corporation contain no entry of any sales of goods to Loewenberg between these dates.

Wolfsohn, on January 1, 1893, prepared a trial balance, showing that the assets of the corporation exceeded its liabilities by $14,000.00, but furnished to the commercial agencies of Bradstreet, Pickens, Fulton & Co., and R. G. Dun & Co., what purported to be copies thereof, in which the excess was falsely represented to be $50,000.00.   From January 1 to June 1, 1893, the California Vineyard Company purchased goods of the value of $10,339.96, while for the same period in 1894 the purchases amounted to $19,-975.83, nearly all which were made during the months of March, April, and May.   About March 29, 1894, Charles M. Morgan, representing Bradstreet's Commercial Agency, called upon Loewenberg, informing him that the

California Vineyard Company had been giving large orders for goods to eastern houses, thereby creating suspicion, and asked him if he thought the orders were given with any intention of securing a large stock of goods with a view to a failure by the company, to which Loewenberg replied, "that he believed Wolfsohn was honest; that he would not gather a stock of goods for the purpose of having it on hand that he might fail; that he did not know how much the company owed; that they owed the bank some, but he would not care to state how much, and that he believed the company was good and responsible." At the time this representation was made to the agent, the company owed about $50,000.00, while its assets were valued at about $37,000.00. Loewenberg then knew the officers of the bank intended to take a bill of sale of the Tacoma stock, and in all probability knew the goods in Portland were to be attached, for he testifies, "that the cashier and directors, about two weeks previous to the attachment, insisted upon some action being taken against Wolfsohn and the California Vineyard Company; that the first step taken was to purchase all the bills receivable; that the bill of sale was made because Wolfsohn was pressed by the bank for payment or security, and he agreed to give the bill of sale of the Tacoma stock, which he did; that the purchases of the bills and the stock were made one right after the other, and after this was done the bank attached." The bills receivable, to which Loewenberg referred, were discounted by the bank May 22, 1894, and it is evident that this was the date at which the bank adopted the course it pursued, although the bill of sale is dated May 31, 1894. Loewenberg knew the company had been losing money, that the bank would make no further advances to it, that it was pressed by other creditors for payment of their demands, and he must also have known it was insolvent, in view of which it seems difficult

to explain his statement to Morgan, "that he believed the company was good and responsible," upon any other hypothesis than that it was made to delay other creditors of the company until the bank could absorb all its property. But it may be claimed, and with good reason, that Loewenberg owed no duty to Morgan, or to the commercial agency which he represented, that compelled him to disclose the financial condition of the company, in view of which fact he might have declined, instead of expressing a false opinion thereon. There are in the record many other facts and circumstances tending to show a conspiracy existing between Wolfsohn and Loewenberg, but we deem the illustrations given sufficient to show that Loewenberg intended to absorb the assets of the company in the payment of its own and Wolfsohn's debts to the bank, for, being willing to apply its property to the payment of Wolfsohn's indebtedness to himself and Mrs. Kuhn, it is not assuming too much to say he was also willing and intended to make a similar disposition of the assets of the company to the payment of Wolfsohn's debt to the bank, and, being its president, the latter should be bound by his act.

The bank collected from the corporation $1,106.65 as interest on Wolfsohn's private debts, and to this extent, at least, its other creditors were injured. It is true, the bank, prior to the incorporation of the company, loaned Wolfsohn $20,000.00, which presumably went into his business, and helped to swell the assets he transferred to the company when it was incorporated; but the agents of the bank knew of the incorporation, and thereafter loaned to it $30,000.00, thereby recognizing its legal existence. If the bank, knowing Wolfsohn intended to incorporate a company and to transfer to it the assets of his business, made no objections thereto, such acquiescence ought to be construed as an admission of its ratification of the

course adopted, and that it relied upon Wolfsohn personally for the payment of his debt, and upon its ability to satisfy any judgment it might obtain against him by a sale of the stock in the corporation received by him for the property so transferred. It must be conceded, however, that if the company had been incorporated by Wolfsohn to defraud the bank, the latter would not have been bound by the transfer of his property, and could, in equity, have followed it and applied the proceeds to the satisfaction of its debt: *Bennett* v. *Minott*, 28 Or. 339 (44 Pac. 288); but the friendly relations existing between Wolfsohn and Loewenberg precludes any inference of fraud, so far as the bank is concerned, from such transfer. The business conducted by Wolfsohn being under his sole control when the bank loaned him the $20,000.00, no equitable trust attached to his property, and, the company not having been incorporated for the purpose of hindering, delaying, or defrauding the bank, it had no equitable interest in the assets of the corporation by reason of the transfer of Wolfsohn's property, and its remedy for the collection of the $20,000.00 and interest thereon was against Wolfsohn's individual property, including his stock in the corporation received as an equivalent for the property so transferred.

The plaintiffs in this suit do not invoke the doctrine of an equitable trust attaching to the property of the corporation by reason of its insolvency, but maintain that in consequence of the fraud practiced by Wolfsohn and Loewenberg the bill of sale and transfer of the stock of goods at Tacoma are fraudulent as to them. The bill of sale and attachment were, in our judgment, parts of one scheme to absorb all the assets of the California Vineyard Company, and, the attachment being fraudulent, it follows that the bill of sale, which was a part of the same transaction, was equally so, and there was no error in

setting it aside, and applying the proceeds arising from the sale of the goods thereby transferred to the satisfaction of the judgments obtained by the plaintiffs.

3.  The payment to the bank of interest on Wolfsohn's private debt was an application of the property of the corporation which inured to the benefit of Wolfsohn, its stockholder, director, and manager, and, the corporation being insolvent at the time such interest was collected, and the officers of the bank having knowledge thereof, a court of equity will follow the company's assets so diverted, and, upon their recovery, apply them to the payment of its creditors, according to their respective priorities: Thompson on Corporations, § 6527.

4.  It must be admitted that the bank had a bona fide claim of $30,000.00 against the California Vineyard Company, but it intentionally omitted to credit a payment thereon of $1,106.65, the amount collected on Wolfsohn's debt, caused the property of the company to be attached, and took judgment for the amount demanded, including the false claim of $1,106.65, and obtained an order for the sale of the attached goods, and the question of law now involved is whether such attachment and judgment are fraudulent as to the creditors of the company who subsequently attached the same goods. In *Fairfield* v. *Baldwin*, 12 Pick. 388, it is held that if property be attached on a writ founded on two demands, one of which is honest and the other fraudulent, and a judgment is rendered for the plaintiff upon both demands, the attachment is wholly void as against a subsequent attaching creditor. In *Page* v. *Jewett*, 46 N. H. 441, it is held that if an attaching creditor take judgment for a claim larger than is due, and seek to collect the whole thereof, this would be such a fraud upon the rights of subsequent attaching creditors as to defeat the prior attachment, unless it affirmatively appear that the error embraced in the judgment was the

result of mere accident or mistake. And in Connecticut an attachment predicated upon a claim willfully false in part is treated, so far as the rights of subsequent attaching creditors are concerned, as wholly fraudulent; but where a false claim, through accident or mistake, is inadvertently blended with a just demand, the attachment will be treated as security for the latter amount: *Ayres* v. *Husted*, 15 Conn. 503. The Merchants' National Bank having intentionally blended a false claim with a just demand against the California Vineyard Company, upon which it caused the property of the latter to be attached, and recovered judgment therefor, which it was seeking to enforce for the whole amount, renders the attachment obtained by it void as to the subsequent attaching creditors of the company, who are entitled to the fund arising from the sale of the property so attached by them in the order of the lien of their respective attachments, but the plaintiffs joined in a common suit for their mutual benefit, thus pooling their claims, in view of which we find no error in the distribution of the fund pro rata among them.

5. In the replevin actions it appears that Wolfsohn, as manager of the California Vineyard Company, anticipating its failure, ordered from the plaintiffs in the respective actions large quantities of goods, so that it might be able to surrender them to its preferred creditors. The goods, having arrived and been delivered to the company, were attached by the Merchants' National Bank, but the plaintiffs, rescinding the sales thereof, by consent of the court brought their actions against the receiver to recover the possession of the goods of which they had been fraudulently deprived. The right of the plaintiffs in such actions, upon the discovery of the fraud, to rescind the contracts of sale is unquestioned (2 Parsons on Contracts, 7th Ed. 922; Newmark on Sales, § 359; Cobbey on Replevin, § 265), and, the attachment by the bank being

fraudulent, the several plaintiffs in said actions are entitled to the possession of their respective goods remaining on hand, and to the amount realized by the receiver for the portion thereof sold by him.

The plaintiffs in this suit also seek to recover from the Merchants' National Bank and Julius Loewenberg all moneys fraudulently obtained by them from the company. And, it appearing that the bank collected from the company $1,106.65 on account of Wolfsohn's debt, and Loewenberg having obtained from the same source and for a similar purpose $113.50, and goods of the value of $250.00, amounting to $363.50, judgments will be rendered against each in favor of the plaintiffs for these respective amounts, which when collected will be applied, after the application of the proceeds of the sale of said goods, so far as necessary to the satisfaction of the judgments awarded the plaintiffs in their respective actions, upon the discharge of which any money so collected from the bank and Loewenberg will be returned to each in proportion to the amount so paid, and as thus modified the decree is affirmed.

MODIFIED.