Argued April 8, affirmed June 16, 1971

SCHMECK ET AL, *Respondents, v.* BOGATAY,
*Appellant.*

485 P2d 1095

L. Orth Sisemore, Judge.

*Stanley C. Jones, Jr.,* Klamath Falls, argued the cause for appellant. With him on the brief was J. Anthony Giacomini, Klamath Falls.

*Blair M. Henderson,* Klamath Falls, argued the cause for respondents. With him on the brief was Arthur A. Beddoe, Klamath Falls.

Before McAllister, Presiding Justice, and Denecke, Holman, Tongue, Howell and Bryson, Justices.

TONGUE, J.

This is an action to enforce payment of additional rent alleged to be due under the provision of a lease which increased the minimum monthly rental payments from $450 to $625 per month upon the occurrence of conditions which are the subject of this controversy. The case was tried before the court,

sitting without a jury. Defendant appeals from a $2,800 judgment for plaintiffs.

In November 1961 plaintiffs leased to defendant a building in downtown Klamath Falls for operation of a shoe store. Defendant had previously been a tenant on the same premises and had also owned two other shoe stores. The other stores, however, had been operated by managers. Although defendant had devoted some time to the other shoe stores, he had his "headquarters" in the building leased from plaintiffs, where he spent most of his time and also personally engaged in the selling of shoes at that store.

The 1961 lease provided for payment of either a minimum monthly rental of $450 or 5% of the yearly gross receipts, whichever was larger. The lease then included the following new provisions:

"Lessee agrees to personally operate a general retail shoe business in said premises during customary business hours, and in the event Lessee shall engage in some new business which should prevent Lessee from devoting his time and efforts to the operation of the business in the leased premises, then the minimum monthly rental to be paid by Lessee to Lessor shall be increased to $625.00 per month."

Plaintiff Schmeck testified that the store was a "first-class" shoe store at that time, but that there had been "talk" of defendant looking for a location for a new store and that the purpose of this provision was to "protect" the lease in the event that defendant should "go into a new store."

Under the 1961 lease, effective January 1, 1963, the store apparently prospered until 1965. The evidence shows that during the period of 33 months from

January 1, 1963, to October 1, 1965, the gross sales were such that for only three months (two in early 1963 and one in 1964) a rental payment of 5% of the gross sales would have been less than $625 per month. The average monthly gross sales during that period exceeded $15,600, so as to produce, at 5%, a monthly rental of over $780.[1]

In 1965 defendant bought a building two blocks from the leased premises. Upon learning this, plaintiff Schmeck was admittedly "unhappy" or "angry" at the prospect of losing a good tenant. Defendant also spent $45,000 in remodeling that building for a new shoe store. Plaintiff then consulted his attorney for advice.

On August 6, 1965, plaintiffs' attorney wrote a letter to defendant stating plaintiff Schmeck's understanding that defendant intended "to remove your retail shoe business to another location." The letter then referred to various lease provisions and included the following statement:

> "Your attention is further directed to the term of the lease wherein you agree to personally operate a general retail shoe business during customary business hours and in the event that you should engage in some new business which should prevent you from devoting your time and efforts to the operation of the business in the leased premises, then the minimum monthly rental to be paid my clients would be increased to $625.00 per month."

Upon receiving the letter defendant took it to his attorney for advice. He then decided that instead of closing the leased store, as he had planned to do,

---

[1] As previously noted, however, the actual computation of rental payments was computed on the basis of 5% of the yearly gross sales.

he would continue its operation for the remainder of the term of the lease, but under a manager.

Accordingly, on October 1, 1965, defendant opened his new shoe store. Since he had more room at that location, he kept his stock inventory there for all of his stores. He also moved his personal office to the new store and it became the center of his operations. As a result, he then spent the "bulk" of his time at the new store and also personally sold shoes there, whereas previously he had spent the "bulk" of his time at the leased store and had personally sold shoes there. Plaintiff Schmeck also testified that, according to his observations, defendant installed cheaper lines of shoes at the leased store and that all of defendant's advertising was for the benefit of the new store.

Beginning abruptly with the month of October 1965, the gross sales for the leased store dropped to less than 25% of their former volume and continued at that level, with operations at a loss, for the remaining 15 months of the lease. As a result, during none of these months was the volume of gross sales such that 5% of such sales would exceed $450 per month, much less $625. Accordingly, and beginning with that month, plaintiffs were paid the minimum rental of $450 per month.

Plaintiff Schmeck testified that at some time after defendant opened the new store on October 1, 1965, he asked defendant if he was going to pay the "extra rent" (i.e., $625 per month) and that defendant said he had been "advised against it" and was not going to do so. Plaintiffs accepted the minimum monthly rental payments of $450, however, and never made any further demand for payment of $625 per month or any complaint about the manner in which de-

fendant was operating either the old or new store until after the expiration of the lease. They then filed this action.

Defendant admitted, however, that after opening the new store he spent the "bulk" of his time there and that he did not know of any reason why the business at the leased store should not have continued at the same level as in the past if he had continued to "operate it as (he) had previously operated it."

In support of the contention that the trial court erred in denying defendant's motion for an involuntary nonsuit and in finding that plaintiffs' claim was not barred by waiver or estoppel, defendant's primary contentions are: (1) that the provision in the lease for an increase in monthly rentals from $450 to $625 was a promise conditioned upon two future events: (a) the entry into a "new business," and (b) a business which, of itself, "prevented" defendant from devoting his efforts to the old store and that both of these two events did not occur; (2) that the trial court, in construing the lease to require defendant's personal presence in operation of the leased store, misconstrued the lease "as if it contained language not present therein"; (3) that the conduct of the parties constituted a "practical construction" of the lease so as not to require the increased rental payment of $625 per month; and (4) that by continued acceptance of rental payments of $450 per month, without objections, plaintiffs waived any right to payments of $625 per month and are estopped to claim otherwise.

The trial court, after carefully considering all of the evidence, found that the intent of the parties in including the lease provision in dispute was that the defendant "be personally present in the business being

conducted on the leased premises during the term of the lease" and that, on the contrary, "defendant was not present to conduct the business on the premises during the term of the lease." After examining the record, we agree with these findings and in this interpretation of the lease provision.

1. There was ample evidence to support the finding that in adding this new provision plaintiffs intended to "protect" the lease, including the substantial rentals previously received on a percentage of gross sales, by the addition of this new provision; that in order to do so it was intended that defendant should continue to "personally operate" the shoe store in the leased premises in the same manner as in the past; that, for the same reason, it was intended that the term "new business" should include any new business in which defendant might engage, including a new shoe store, and that if defendant engaged in the operation of a new shoe store in such a manner as to prevent him from continued personal operation of the old shoe store, the minimum monthly rentals were to be increased to $625.

Defendant raises the question whether, at the time of entry into that "new business" on October 1, 1965, defendant was *then* "prevented" from continuing to "personally operate" the old shoe store. Thus, defendant cites authorities for the proposition that no duty arises under a "conditional promise" dependent upon future events until all of the future events making up the condition have occurred.

Defendant is mistaken, however, in assuming that all of the "future events making up the condition" must have occurred when he first opened the new store on October 1, 1965, in order for the lease pro-

vision to become effective. The term "engage in a new business" is not so limited in point of time. Thus, defendant not only moved his office and inventory to the new store on October 1, 1965, but as each month passed defendant continued to devote the "bulk" of his time to the operation of the new store, including the personal sale of shoes, whereas he had previously devoted the "bulk" of his personal time and efforts to the operation of the leased store. Under these facts, there can be no doubt but that defendant "engaged" each month in a new business which "prevented" him from "devoting his time and efforts to the operation of the business in the leased premises," as provided by the lease provision.

Thus, the trial judge was correct, both legally and from a very practical standpoint, in holding that the "conditions" of the lease provision had "occurred" and that this was what the parties intended to protect against by that provision in the lease. For the same reasons, defendant's contention that the trial court misconstrued the lease must also be rejected.

2. We next consider defendant's contention that the conduct of the parties, including the acceptance of payment of $450 as rent each month, without complaint regarding the manner in which defendant was conducting either the new store or the leased store, constituted a "practical construction of the lease so as not to require the increased rental payments of $625 per month." In making that contention, however, defendant would have the court ignore the letter written by plaintiffs to defendant shortly before opening his new store and warning that plaintiffs would insist upon compliance with this very provision in the lease. Defendant would also ignore the testimony of

plaintiff Schmeck that after defendant opened the new store he asked defendant whether he was going to pay the increased rental payments and was told that defendant had been advised not to do so.

In view of this evidence, defendant's contention of "practical construction," which implies the construction of a contract by *both* parties, must be rejected. For the same reason, defendant's contention that plaintiffs waived compliance with the lease provision in question must be rejected, since waiver must be manifested in some unequivocal manner and requires an *intent* to relinquish a known right. *Waterway Terminals v. P. S. Lord,* 242 Or 1, 26, 406 P2d 556 (1965). In this case, on the contrary, plaintiffs' conduct was not an "unequivocal" construction of the lease to the effect claimed by defendant and, in addition, plaintiffs had no intention to so construe the lease or to waive the benefits of the lease provision.

3. This leaves for consideration defendant's contention that plaintiffs are estopped by their conduct from enforcing that provision of the lease. Thus, defendant contends that if plaintiffs had refused to accept the monthly rental payments of $450 or had otherwise communicated any objections concerning defendant's performance of the lease, defendant "could have and would have remedied his conduct, if any, to the extent necessary to satisfy the requirements of the lease," but that instead plaintiffs accepted such monthly payments as full payment for each month, without raising any question or objection, and should be estopped to claim later that the payments were not accepted as full payment for each month. More specifically, defendant contends that performance of conditions of a contract is not only waived by acceptance of performance different from the per-

formance required by the contract, but that acceptance or acquiescence may also be the ground for an estoppel without any change of position by the party claiming the estoppel, it being required only that the acts of the other party were such as to mislead the party claiming the estoppel to continue the course already begun, believing it to be acceptable to the other party.

It is true that estoppel by conduct, as distinguished from waiver, may not require proof of intent. *Ashley v. Pick,* 53 Or 410, 417, 100 P 1103 (1909); *Boyce v. Toke Point Oyster Co.,* 145 Or 114, 118, 25 P2d 930 (1933); *First National Bank v. Stretcher,* 169 Or 532, 538, 129 P2d 830 (1942), and *Hemshorn, Deceased, Lelek v. Hemshorn,* 184 Or 364, 376, 198 P2d 597 (1948). Cf. *Waterway Terminals v. P. S. Lord, supra,* at 26. But see *Earls et ux v. Clarke et al,* 223 Or 527, 530-31, 355 P2d 213 (1960).

It may also be true that, under some circumstances, there may be an estoppel by consent or acquiescence, despite the fact that there has been no change of position by the party claiming the estoppel, where the conduct of the other party has been such as to mislead the party claiming the estoppel to continue a course of conduct already begun, believing it to be acceptable to the other party. *Harvey Radio Laboratories v. United States,* 115 F Supp 444, 449, 126 Ct Cl 383, cert den 346 US 937, 74 S Ct 377, 98 L ed 425 (1953); *Mahoning Investment Co. v. United States,* 3 F Supp 622, 630, 78 Ct Cl 231, cert den 291 US 675, 54 S Ct 526, 78 L ed 1064 (1933); and *United States v. Hanna Nickel Smelting Company,* 253 F Supp 784 (D Or 1966), aff'd 400 F2d 944 (9th Cir 1968). See also 3 Pomeroy, Equity Jurisprudence (5th ed) 230, § 813.

It is clear, however, as held in *Foster v. Agri-Chem, Inc.*, 235 Or 570, 576-77, 385 P2d 184 (1963), quoting 5 Corbin, Contracts 984, § 1245:

"* * * The mere receipt of the defective performance is not in itself sufficient to discharge the claim to damages for the breach. There must be an expression of assent to accept it in satisfaction and as a complete discharge * * * of the obligor's duty * * *."

To the same effect, see *City of Hillsboro v. James & Yost*, 240 Or 433, 446, 402 P2d 511 (1965).

In this case, on the contrary, while it is true that plaintiffs accepted payment each month of rental payments of $450, there was no "expression of assent to accept it in satisfaction and as a complete discharge." Instead, both by letter dated August 6, 1965, and by subsequent conversation, plaintiffs indicated their intention to enforce the lease provision under which monthly rental payments of $625 should have been made.

Furthermore, it is also well established that silence or passive acquiescence is not alone sufficient to constitute an estoppel by conduct from asserting a right. *Waterway Terminals v. P. S. Lord, supra,* at 24. In addition, there must have been a duty to speak or give notice and there will be no estoppel unless the other party was not only ignorant of the truth and otherwise entitled to rely upon such conduct, but also unless he did in fact rely upon such conduct and, as a result, was misled into doing or refraining from doing something that he would not otherwise have done or refrained from doing. *Ashley v. Pick, supra,* at 416-17; *Marshall v. Wilson,* 175 Or 506, 518, 154 P2d 547 (1944). See also *U.S. Nat. Bank v. Erickson et al,* 208 Or 141, 152, 300 P2d 449 (1956).

In this case, however, as previously noted, plaintiffs gave notice by letter dated August 6, 1965, of their intention to assert the rights conferred by the lease provision. Thus, defendant knew that plaintiffs intended to assert such rights and had no right to rely upon either plaintiffs' silence or their acceptance of the monthly rental payments of $450 or to claim that he was misled by such conduct. See also *Fraser v. Portland,* 81 Or 92, 95-6, 158 P 514 (1916) ; *State ex rel v. School District No. 9,* 148 Or 273, 288, 31 P2d 751, 36 P2d 179 (1934) ; *Bradford v. Western Oldsmobile, Inc.,* 222 Or 440, 452, 353 P2d 232 (1960) ; and *Pilloud et ux v. Linn-Benton Park Ass'n,* 228 Or 324, 330, 365 P2d 116 (1961).

Finally, the trial court found from the evidence in this case that "there was no showing of a change of operation on the part of the defendant by reason of the failure of the plaintiffs to protest." In other words, defendant failed to sustain his burden to prove that he did, in fact, rely upon plaintiffs' conduct and was misled to his prejudice by such conduct into either doing or refraining from doing anything that he would not otherwise have done or refrained from doing. Upon examination of the entire record, we hold that there was substantial evidence to support that finding by the trial court. Cf. *Bradford v. Western Oldsmobile, Inc., supra,* at 452-53.

For all of these reasons, the judgment of the trial court is affirmed.

Affirmed.